# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/30/11

**SHERIF R. KODSY**

**CLAIMANT / APPELLANT**

**Vs.**                                              **11 Civ. 4180 (NRB)**

**GENERAL MOTORS CORP., ET AL.,**

**DEBTORS / APPELLEES'.**

Re: **MOTORS LIQUIDATION COMPANY, et al.,    09-50026 (REG)**
    f/k/a General Motors Corp., et al..

## APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**SHERIF R.KODSY**
**APPELLANT/PRO'SE**
**15968 LAUREL OAK CIRCLE**
**DELRAY BEACH, FLORIDA 33484**
**561-666-0237**

PRO SE OFFICE

# TABLE OF CONTENTS

CITATIONS…………………………………………………….i-iii

TABLE OF AUTHORITIES……………………………………....iv

INTRODUCTION…………………………………………….....1

STATEMENT  OF THE CASE……………………………...…....1

STATEMENT OF FACTS……………………………………....4

WORK REPAIRS HISTORY…………………………………....5

STANDARD OF REVIEW……………………………………10

SUMMARY OF THE ARGUMENT…………………………...11

**Kodsy's claim for fraudulent inducement, fraudulent misrepresentation and malice with intent to injure, should be a secured claim, according to section 523(a)(6), and within the meaning of Section 1129(a)(7)(B) & (b)(2)(A).**

ARGUMENT……………………………………………16

LEGAL ARGUMENT…………………………………...…16

CONCLUSION…………………………………………22

RELIEF THOUGHT……………………………………23

CERTIFICATE OF COMPLIANCE………………………….....25

CERTIFICATE OF SERVICE………………………………....25

# TABLE OF CITATIONS

Anderson v. Liberty Lobby, inc., 477 U.S. 242, 251-252 (1986)....................24

Arm, 87 F.3d 1046 (9th Cir. 1996)..............................................21

Arm, 175 B.R. 349 (9th Cir. B.A.P. 1994), *aff'd*, 87 F.3d 1046 (9th Cir. 1996)...................................................................21

Ashley, 903 F.2d 599, 604, n. 4 (9th Cir. 1990)..............................21

Begun, 136 B.R. 490, 494 (Bankr. S.D. Ohio 1992)............................21

Bernard Lumber Co. v. Patrick (in re Patrick), 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001)....................................................................18

*Burleson Constr. Co. v. White* (In re White*)*, 106 B.R. 501, 505-06 (Bankr. E.D. Tenn. 1989). ...........................................................18

Carrillo v. Su (In re Su), 290 F.3d 1140 (9 Cir. 2002)......................17

Cal Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9 Cir. 2003)"....................................................................16

Cobe, 229 B.R. 15 (9th Cir. B.A.P. 1998)....................................21

Commercial Bank and Trust v. McCoy (in re McCoy), 269 B.R. 193, 199 (Bankr. W.D. Tenn. 2001)..........................................19

Digital Commerce Ltd. V. Sullivan ( in re Sullivan), 305 B.R. 809, 823 (W.D. Mich.2004)....................................................................17

Groetken v. Davis (in re Davis), 246 B.R. 646, 652 (10TH Cir. BAP 2000)(citations omitted)...................................................................19

Haney v. Copeland (in re Copeland), 291 B.R. 740(Bankr. E.D. Tenn. 2003)...................................................................19

Hill v. Smith, 260 U.S. 592 (1923)...................................................17

Hultquist, 101 B.R. 180 (9th Cir. B.A.P. 1989)........................................22

Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)........................................20

Markowitz v. Campbell (in re Markowitz), 190 F. 3d 455, 646 (6th cir. 1999).......................................................................................20

Muegler v. Bening, 413 F.3d 864 (9th Cir. 2005)....................................21

Omegas Group, inc., 16 F. 3d 1443, 1451 (6th cir. 1994...........................17

Palmacci v. Umpierrez, 121 F.3d 781, 788 (1st cir. 1997)(citations omitted)...................................................................................18

Pelletier V. Zweisel, 921 F. 2d 1465 (11TH CIR. 1991) ..............................1

Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9 Cir. 2001)............17

Poole, 167 Ill.2d at 48, 212 Ill.Dec. 171, 656 N.E.2d at 771.......................24

Rembert, 141 F3d 277, 280 (6th cir. 1998)(emphasis added)........................17

*Rembert*, 141 F.3d at 281.............................................................18

Sullivan, 305 B.R. at 824, quoting McClellan v. Cantrell, 217 F. 3d 890, 893 (7th Cir., 2000)..............................................................4

Trantham, 304 B.R. 298, 307 (6TH Cir. BAP 2004)...................................20

Trantham , 304 B.R. at 308............................................................21

Wolf v. McGuire (in re McGuire), 284 B.R. 481, 492 (Bankr. D. Co. 2002)...................................................................................19

# <u>TABLE OF AUTHORITIES</u>

Section, §523(a)(6)………………………………………..……………………..1

§ 501.202 Fla. Stat………………………………………………………………1

18 U.S.C. § 1964 The Racketeer Influenced and Corrupt Organizations Act ("RICO")………………………………………………………………….……..1

§523(a)(2)(A);…………………………...……………………………………….4

Section 1129(a)(7)(B) & (b)(2)(A)………...……………………………………10

§ 523(A)(6)……………………………………...………………………………16

11 U.S.C. 523(A)(2)(A) : FRAUDULENT MISREPRESENTATION……...…..17

Section 727, 1141, 1228(a), (1228(b), or 1328(b)……………………….……..20

§ 523(a)(2)(A) - reasonable reliance - intent to deceive……………………..…22

Fed. R. Civ. P. 56(c)…………………………………………………………....24

## INTRODUCTION

Comes now plaintiff, Sherif Rafik Kodsy, as pro'se, herein as Kodsy, files his initial brief in this proceeding according to Federal rule 8010.

The instant case is pursuant to **§523(a)(6)** and **§ 501.202 Fla. Stat.**
**which provides**: "The provisions of this part shall be construed liberally to promote the following policies: (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices. (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. (3) To make state consumer protection and enforcement consistent.

**The Racketeer Influenced and Corrupt Organizations Act 18 U.S.C.**
**§ 1964 ("RICO"),** common law fraud and deceit, breach of contract, and breach of warranty. **Pelletier V. Zweisel, 921 F. 2d 1465 (11**[TH]
**CIR. 1991) .**

## STATEMENT OF THE CASE

Appellant, purchased the subject vehicle as used with 230 miles on the odometer, on 08/19/2008, a 2008 HUMMER H2, from Coral Cadillac, inc.

In April 2009, a seven count lawsuit was filed in the instant case;

1

1-Fraud, 2-Breach of Warranty, 3- Bad Faith, 4- Conspiracy, 5- Negligence, Strict Liability, 6- Personal Injury,  7- Damages and Punitive Damages.

The factual counts of the complaint filed, listed seven counts, which was supported by the actual sale of a Misrepresented new vehicle with known defects at the time of the sale, not disclosed, which  the Appellees' Predicate Act was to conspire in the sale of the subject vehicle to fraudulently induce it's sale as used by the authorized dealer, Coral Cadillac, inc., under False Pretenses of a Demo, to avoid a liability, in which those defects were not disclosed, or warned, which the subject vehicle was previously a show truck for General Motors Corporation, with an elevated inherent design defect, which it was not used to show to potential buyers, which could not be conformed after relinquishment from assembly line manufacturing. Lemon law transcript page 17-18., states by the manufacturer's agent, it was not placed in the stream of sales by the manufacturer, but was sold at a Georgia auction to the authorized dealer, Coral Cadillac, inc., which the authorized dealer sold the truck under false pretenses, as a used DEMO, without truthful disclosures of the subject vehicle's origin, prior use or defects, which caused unexpected injuries in a short period of time, which the manufacturer and authorized dealer knew or should have known that the loud noised and elevated whole body firm

vibrations inherent in the subject vehicle would cause injuries and death from prolonged exposures, hence the authorized dealer had an inherent interest in the outcome of this proceeding and conspired with appellees' agents to defraud the consumer of the product through intentional malice.

Appellant first pursued the Lemon Law action to repair/replace the subject Vehicle, in December 2008, after several attempted repairs, which those conspired upon grossly negligent attempted repairs and the biased Lemon Law opinion, was then appealed to the Circuit Court for a Denovo review, which was a limited and biased proceeding due to the appellees' Chapter 11Bankruptcy  filing, which allowed the defendants' to maliciously further misrepresent the repairs and product, where the bankruptcy stay allowed for the filing of liens for liability(ies) on remaining counts, in a separate action in Federal court.

The conspired upon malice extended by the Appellees' was with Careless and Reckless Intentional disregard to Bio-Mechanical health and safety standards, which was injurious and life threatening to the consumer of the product, herein,  which was not tested for its elevated vibration magnitude according to recognized and professional standards established by the industry of mechanical standards ISO11631 and OSHA, regulations and standards.

3

Even where a party fails to prove the standard traditional elements of misrepresentational fraud, courts have broadly construed Fraud in the context of **§523(a)(2)(A):**

Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

**Sullivan, 305 B.R. at 824, quoting McClellan v. Cantrell, 217 F. 3d 890, 893 (7th Cir., 2000).**

### STATEMENT OF FACTS

The subject vehicle received several attempted repairs, however once the repairs were unsuccessful, it was admitted that the subject vehicle elevated non-conformed design was inherent with the elevated vibration due to its off-road design, while on-road, and that there was no fault found compared to a similar vehicle, such as a Cadillac Escalade with a similar size engine, which was without measurements of the elevated vibration magnitude and without warnings, prior to the sale of the wholesaled vehicle.

Kodsy, previously leased a 2008 Hummer H2, with the same 6.2 litre

4

Engine, similar to the subject vehicle, which there was no elevated vibration present and further Kodsy owned for 5 years a new Chevy Z-66, which had the same chassis and frame of the Hummer H2, without any abnormal Bio-mechanical issues, where Kodsy, further owned many cars and trucks with a V8 engine without any elevated vibrations or non-conformities like the ones detected and experienced in the subject vehicle.

The following is the description of repairs performed by Appellees' through their authorized repair facility(s), which it contradicts its own findings of no fault found from the attempted repairs and contradicts the independent inspections and manufacturer's product allegation preliminary inspection report.

## WORK REPAIRS HISTORY;

1-The invoice #540280, 10/22/08, with 5224 miles on the odometer, page one, a- states that the mass airflow sensor shorted out due to fouled spark plugs that required R&R. due to engine irregular vibrations and hesitations, as this vehicle was driven to the Coral Cadillac Hummer dealer. not as stated, "engine won't stay running". page one, b- reprogram transmission control module. E- excessive rust under front of vehicle, R&R tie rods both front axle and tie rod ends and front axles required a coating with POR 15 rust 3PIT3749B: underbody corrosion and coated tie rod ends as well.

2-  According to the invoice #541007 on 11/05/08 page one, A- it states that the brakes squeal, special order part on back order. B- exhaust system align, exhaust vibration engine firing pulses transferring into vehicle, install exhaust weight to pipe, necessary for vibration in vehicle. C- rotate 4 tires. E- Transmission won't shift, cause of transmission control module, control solenoid valve and transmission control module assembly replacement, not 6553 transmission control module T.A.C. case # 10583778 , 11/12/08, perform diag. sys. check, install tech2  and road test truck, command all shift while driving , ok, part throttle down shift to 4th gear engine flair/up & does not increase speed on highway, no codes c, check trans fluid level ok, attempt to recalibrate module has current update. R &I could not reprogram module, after after trans module replace tech could not reprogram new module, code #u0101 loose communication call tech line, for info. Claim code #18f45 11/12/08. Multiple attempt before module takes program.

3-  The invoice #541391 on 1/13/08, page one, A-  states , constant vibration during acceleration, noise vibration at IPC, reposition A/C compressor discharge line, relocate a/c high pressure hose from wheel well area, after above repair still had some vibration in steering wheel and seat. Compared with like vehicle had same vibration. Filled report with Bob Martin H2 BQM, R&I  starter as per Bob Martin, remove flywheel bolts and

restart engine to isolate  vibration , "still has vibration with flywheel disconnected". B- and it further contradicts its discovery, by stating , "no fault found". page two C-, states the transmission hesitation required a reprogramming of a control module engine. page two, D- states a noise caused by driving vibrations, [wind noise], that required a loosened part replacement.

4- The Schumaker invoice #443188, 12/3/08, page one, a- admits vibrations and hoping requiring tire inspections and three tire replacements, to address the defect condition, of roaring and hopping felt at 45 mph and up after measuring the HZ output of the tires, which was 13 HZ, and the G-force on the vehicle was documented to be .09G's.

5- The Schumaker invoice #443510, 12/05/08, page one, a- asserts that there is still a hop and vibrations present after the new factory tire replacements, page one b- states a rental vehicle was provided during inspection of NPF, no DTC or current bulletins, was found for the elevated vibration which was remaining.

6- The invoice #543204, was the final inspection from Coral Cadillac authorized dealer on 12/23/08, which page one, A- states, vehicle exhibits some rail shake, without any diagnostic testing. this was a final repair order attempt by the Cadillac dealer that failed to eliminate the inherent defect

condition of elevated vibration through conspiracy with Tom Thornton, the region service manager, alleging the vehicle is operating to specifications at this time, previously compared with like vehicle, an opinion with malice and without listing any diagnostic bio-mechanical specifications.

7- On 01/21/09 the Manufacturer Product Allegation report documented a hesitant engine miss and a non conformity in the tires.

8- On 03/02/09, a final inspection by the manufacturer was performed, which Kodsy was forced to ride with the manufacturer's agents or no inspection would occur, was when Kodsy, was ill from the elevated vibration and bouncing/hopping, and had the subject vehicle towed to that location, which the manufacturer agents conspired to deny any nonconformities remaining in the truck, which was alleged to be similar to another, which no other vehicle was produced during that inspection  and they failed to perform any bio-mechanical measurement to document the elevated vibration magnitude.

9- On 11/12/09, the Maroone of Delray, an authorized dealer, physically inspected the subject vehicle and documented an elevated vibration condition was present and visible from engine.

10-      The Palm Beach Garage inspection on 02/20/09, of the subject vehicle stated,"exhaust vibrations felt through-out car".

11-      The Scott May inspection from the Dual Diamond Exhaust, inc.,05/04/2009  it stated fuel and timing problem/internal causing the vibration. Mr May, had been an expert mechanic for over 25 years and had previously worked for the General Motors Authorized dealers as a problem solver, referenced in his deposition page 27 to page 39. Mr. May,  had further testified to in his depo, page 107, line 20- 23, " it just doesn't ride right. other than the vibration and the way it rides is uncomfortable, like a bouncing effect." page 108, line 1-5, " the suspension or the tires are bad on it. you can just feel it just doesn't ride like it should. it's not smooth."

12-      The lemon law board decision, which lasted a duration of 5 minutes by driving the vehicle one mile around the block at 25 mile an hour speed, which was documented that the vehicle was similar to a "BEAST" of a truck, due to its elevated performance, which was disregarded as a common trait for that vehicle and that according to the hearsay testimony presented by the manufacturer's agents all repairs and diagnostics were completed and no problem was found, needless to say without any bio-mechanical measurements. See Lemon Law transcript, page 77-85 and 91-100.

The transmission had received three failed attempts to repair and the elevated vibration remained, which also had received three attempted failed

9

repairs and underbody rust was still remaining after alleged rust treatment applications.

The appellees', filed for Bankruptcy and plaintiff/appellant was forced to file in the United States Bankruptcy Court for the Southern District of New York, as a claimant in this proceeding for counts', 1-Fraud, 2- Breach of Warranty 3- Bad Faith, 4- Conspiracy, 5- Negligence, Strict Liability, 6- Personal Injury, 7- Damages and Punitive Damages.

A secured claim was established in the Bankruptcy court for $15 million, which appellant/claimant  previously offered the debtors a settlement for a lesser amount, to expedite relief, which they did not honor it  in good faith to settle, where this appeal follows.

## **STANDARD OF REVIEW**

This appellate review follows, due to the order issued by the bankruptcy court judge, which allowed the appellees'/debtors to change the claimant's secure claim to an unsecured claim, where the fraudulent inducement  and malicious mechanical misrepresentation causing near death injury(ies), had received conspired malice from their agents to further misrepresent their product, should be allowed as a secured lien on the debtors property, according to **section 523(a)(6)** and  within the meaning of **Section 1129(a)(7)(B) & (b)(2)(A).**

10

## SUMMARY OF THE ARGUMENT

Tom Thornton is a Service District Manager from General Motors, Corporation and he does have an interest in this alleged repair proceeding.

He Alleged that he was a Naval academy engineer, without any proof of such, which he could not rationally testify as to how the exhaust system alignment with weights would cure such a defect of elevated vibration or on what specific area they would be installed with what guidelines, he testified to mislead Kodsy and the court, by his alleged engineer Naval status, which no proof of such status or what type of engineer he was, was not provided in evidence, which he was able to allege with certainty that a sound travels in vibration waves, which he could not correlate the repairs to a consistent observation as simply stating a sound can be measured to its output of produced friction, which no bio-mechanical testing was performed to measure the wave frequency of the vibration in the subject vehicle chassis.

Tom Thornton did infact state that the Hummer H2's for 2010-2011 are still in manufacturing knowing that the HUMMER H2 brand was discontinued, for its elevated design, which he could not intelligently answer the technical alignment repair from an engineer's point of view for the installation of a weight on the exhaust pipe.

11

As for the testimony that mr Thornton testified to, was that the Hummer evolved from a military vehicle (the Humvee) as intended for heavy duty off road use, which Kodsy was not warned prior to the purchase of the subject vehicle that he was purchasing an off-road vehicle, instead Kodsy was fraudulently induced to believe that he was purchasing a conformed luxury SUV., Similar to or better than a comparable Cadillac Escalade, the off-road term was not disclosed prior to purchase, instead it was used to mislead the justification for an existing defect, which no disclosures to heed  excessive usage was communicated , which the advertised chassis specs. , relied upon by Kodsy, was advertised and published by the Lynch HUMMER, an authorized dealer, which was stated the HUMMER H2, to have a chassis measurement of  4.3 HZ.

As further the Navy and the Army used those alleged Humvees, a HUMMER H1, during the "Desert Storm" and many of its officers were injured, as a result of  prolonged use and it is well documented and acknowledged by many available online documents from OSHA and documents produced by the Armed forces that the elevated vibrations in large and off-road motor vehicles are a dire concern to cause injuries, which should be carefully monitored so as not to be used more than a certain amount of time per day.

12

The Joe Bardil, testified in the Lemon Law hearing page 81-82an authorized service mechanic for G.M., testified to a single three pound weight at trial, not as transcribed regarding two weights and infact there were no weights found on the truck, which when questioned about the location of those weights as to where it was installed he could not intelligently answer and claimed that it was placed in the convertor, while he was directly involved with the placement of that weight, but that it was installed for the elevated vibration found in the subject vehicle.

As further he lied about the subject vehicle abnormal vibrations, which he alleged that it was compared to an Cadillac Escalade with the similar engine and alleged that he road tested the Hummer H2 and did not observe any abnormal vibration, which he expressly meant to say felt instead of observe, which if that was collaterally true than no further service attempted repairs would have been needed, instead the Manufacturer's Product Allegation Report, the Schumacher Hummer service reports, the Marroone service reports and Independent inspections performed, contradict that testimony, which it was primarily alleged in the work orders that it required sic., a mass airflow sensor, an A/C hose to be transferred , a disassembly of the flywheel, a transmission reprogram three times, a weight installation in the exhaust , brake pad replacements, loosened components replacements

13

and underbody rust inhibitors and tires replacements, which after all those attempts it was still documented to reflect that an elevated vibration remained, which was alleged sic. to be similar to another, an opinion without any biomechanical testing for an elevated vibration felt in the chassis and cab compartment.

The Bardill testimony had further alleged the use of an (EVA) Electronic Vibration Analyzer, yet that also was a conspired upon fraudulent statement and not evidenced by the work orders, which he testified that the G-Force was the type of inspection he performed by using the (EVA), which he stated it was below a .03 G-Force measurement, which was contradicted by the Schumacher service report to register .09 G-Force measurement, after it was allegedly inspected by the Joe Bardill from Coral Cadillac, the authorized dealer, however the .001 G-Force measurement does not measure vibration, it only measures vertical shock, commonly described as Ground Force, which is not remotely relevant to a vibration measurement.

The lateral and horizontal  whole body vibration produced and felt in the subject vehicle chassis,  steering wheel,  and seating was the main biomechanical concern, which was not tested,  as it is commonly measured in an ( HZ) measurement and can only be measured in an HZ measurement, to determine the wave frequency of molecular vibration , which the

authorized dealers could not even dictate the G-force measurement as it was testified to and documented to be a one decimal count off, where it has two decimals , which is evidence that that test was not even understood or performed by the Appellees' agents.

The Schumacher repair attempt did document a 13 HZ measurement from the tires alone, while the tires were off the truck on the balancing tire machine, which 3 tires were replaced, however the Chassis was not laterally tested for its vibration frequency magnitude, which after the 3 tire replacements, it was documented that an elevated vibration remained after alleged conformity repairs. See the Schumacher Hummer service repair invoices, the Scott May notarized statement and filed testimonies, the Marroone inspections and all other independent  inspections.

The oxymoron statements of Joe Bardill re; the dampening of the vibration as he described it, as placing a weight on the exhaust pipe, was seriously lacking intellect as it was described to be like putting a finger on a guitar string, which could not possibly be correlated to a three  inch steel pipe connected and extruding from a 393 horsepower engine, which putting a weight on that rigid already  fastened exhaust pipe would not deaden anything as it was **already fastened to the chassis and was not the source** of the producing energy contributing to the vibration, as it would have been

15

similar to adding a metal weight to the chassis of the vehicle, a very ironic hypothetical statement, without attributes to its remedial purpose.

## **ARGUMENT**

Appellees' were manufacturer's of the subject vehicle, and will continue to manufacture bio-mechanical vehicles in the future, after this proceeding in bankruptcy court, once discharged, hence if not sanctioned, it would be like allowing them to continue their fraudulent inducements, which consumers in general do not like to be taken for a ride and lied to, when a life threatening mechanical and bio-mechanical non conformity requires a repair or measurement in HZ, to correlate to Advertised Chassis Specs., and OSHA safety standards.

Appellees' failed to meet up to their obligations as a manufacturer for a Bio-mechanical safety concern and continues to defraud the general public with out a care or concerns for a bio-mechanical nonconformity Safety issue after relinquishment of its product and during its warranty period.

## **LEGAL ARGUMENT,  § 523(A)(6)**

**Cal Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9 Cir. 2003)".** T]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrong doing that caused the debt." [internal citation omitted]). Willful and

16

Malicious Injury Code **§523 (a)(6) excepts** from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." To avoid the effect of a discharge , the burden is on the creditor to prove that the debt falls within the exception claimed. **Hill v. Smith, 260 U.S. 592 (1923).**

## 11 U.S.C. 523(A)(2)(A) : FRAUDULENT MISREPRESENTATION

**Section 523 (a)(2)(A)** excepts from discharge any debt for money, property, [or] services… to the extent obtained by false pretenses, a false representation, or actual fraud…

In re **Rembert, 141 F3d 277, 280 (6th cir. 1998)(emphasis added).** See also **Digital Commerce Ltd. V. Sullivan ( in re Sullivan), 305 B.R. 809, 823 (W.D. Mich. 2004).**

The purpose of section  523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud. In re **Omegas Group, inc., 16 F. 3d 1443, 1451 (6th cir. 1994.**

**Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9 Cir. 2001).**

Maliciousness requires a finding of "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." **Id. at 1209.** See also **Carrillo v. Su (In re Su), 290 F.3d 1140 (9 Cir. 2002).**

Exception to discharge, **§ 523(a)(2)(A) element**, fraudulent intent, is measured by a subjective standard. *See **Rembert,** 141 F.3d at 281*.

Intent , under in re Rembert, is measured subjectively.  A debtor intends to deceive a creditor, "when the debtor makes a false representation, which the debtor knows or should have known would induce another to advance goods or services to the debtor." **Bernard Lumber Co. v. Patrick (in re Patrick), 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001).** Fraudulent intent requires an actual intent to mislead, which is more than mere negligence… A 'dumb but honest' [debtor] does not satisfy the test". **Palmacci v. Umpierrez, 121 F.3d 781, 788 (1st cir. 1997)(citations omitted).**

*See id.* **at Rembert 282**. Such purpose may therefore be inferred from the totality of a defendant's conduct. *See **Burleson Constr. Co. v. White** *(In re White**), 106 B.R. 501, 505-06 (Bankr. E.D. Tenn. 1989).**

A debtor's fraudulent intent, may be inferred from the totality of the circumstances. The court must consider whether the totality of  the circumstances' presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.' The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.

(1)The debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
(2) The debtor intended to deceive the creditor;
(3) The creditor justifiably relied on the misrepresentation; and
(4) The creditor's reliance was the proximate cause of its loss.

**Wolf v. McGuire (in re McGuire), 284 B.R. 481, 492 (Bankr. D. Co. 2002)(quoting Groetken v. Davis (in re Davis), 246 B.R. 646, 652 (10TH cir. BAP 2000)(citations omitted).** " A creditor can present proof of surrounding circumstances from which a `[c]ourt can infer a dishonest intent." **Commercial Bank and Trust v. McCoy (in re McCoy), 269 B.R. 193, 199 (Bankr. W.D. Tenn. 2001).**

As explained by the court in **Haney v. Copeland (in re Copeland), 291 B.R. 740(Bankr. E.D. Tenn. 2003):**

Proving the debtor's intent to defraud is similar to proving the debtor's knowledge and or recklessness as to the falsity of the representations made. Because intent is a purely subjective question, the court must examine the totality of the debtor's actions to determine if they possessed the requisite intent to deceive plaintiffs.

In the present case, the debtor's misrepresented the subject vehicle when sold to plaintiff as a used DEMO, to conceal the inherent nonconformity defects of a "show truck", to obtain a sale of the subject vehicle, which in turn the defendants' misrepresented the subject vehicle repairs to deny a

19

liability to plaintiff, where plaintiff was injured from the elevated design without warnings of prolonged exposures, which plaintiff. thought he was investing in a conformed SUV and relied on the dealer and manufacturer of the subject vehicle for daily use as a **Specialty Indoor Environmental Contractor,** which required prolonged daily usage of the subject vehicle, which rendered Kodsy's investment at a great disadvantage with limited use of a large vehicle, in addition to rendering Kodsy, with  permanent physical disabling injuries from the prolonged use and reliance in their malicious inspections and misrepresented defective product.

   **Section 523 (a)(6) states:**

   (a) A discharge under **section 727, 1141, 1228(a), (1228(b), or 1328(b)** of this title does not discharge an individual debtor from any debt-

   The supreme court has held that an injury is "willful" under section 523(a)(6) if the debtor desired to cause the consequences of his act or if the injury was substantially certain to result. **Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Markowitz v. Campbell (in re Markowitz), 190 F. 3d 455, 646 (6th cir. 1999).** Thus section 523(a)(6) bars discharge of debts arising from intentional torts. In re **Trantham, 304 B.R. 298, 307 (6TH cir. BAP 2004). Section 523(a)(6)** also requires that the debtor acted " maliciously." Courts have defined malicious as " in conscious disregard of one's duties or

without just cause or excuse; it does not require ill-will or specific intent."

**Trantham , 304 B.R. at 308.**

**Muegler v. Bening, 413 F.3d 864 (9th Cir. 2005)**

"It is only the fact of an adverse fraud judgment, and nothing more, that is required for a debt to be nondischargeable." The debtor does not need to have received a benefit from the fraud.

In re **Cobe, 229 B.R. 15 (9th Cir. B.A.P. 1998),** State Court award based on finding of intentional misrepresentation satisfied elements for nondischargeability.

In re **Arm, 87 F.3d 1046 (9th Cir. 1996),**

"We make clear, what we have not held before, that the indirect benefit to the debtor from a fraud in which he participates is sufficient to prevent the debtor from receiving the benefits that bankruptcy law accords the honest person. *See In re Ashley,* **903 F.2d 599, 604, n. 4 (9th Cir. 1990)."**

In re **Arm, 175 B.R. 349 (9th Cir. B.A.P. 1994),** *aff'd,* **87 F.3d 1046 (9th Cir. 1996),** where Benefit to debtor need not be direct.

In re **Begun, 136 B.R. 490, 494 (Bankr. S.D. Ohio 1992),**

"False Pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression . . . . A false pretense has been defined to include a "mute charade" where the debtor's conduct is designed

21

to convey an impression without oral representation. . . . . A "false representation" on the other hand is an expressed misrepresentation.

In re **Hultquist, 101 B.R. 180 (9th Cir. B.A.P. 1989)**

**§ 523(a)(2)(A) - reasonable reliance - intent to deceive.**

## CONCLUSION

Kodsy, almost died from the over-exposures to the elevated vibrations, which were not warned or known to Kodsy that an injury could occur and in a short period of time, which Kodsy experienced Profound migrant headaches, elevated heart beats and constant fatigue, within 3 months a brain injury was discovered, and within 3 more months a knee injury, numbness in hands, weakness in legs and finally an umbilical hernia and constant heart pains and compromised vision.

The subject vehicle was discovered to be the cause of injury after the perplexed knee injury, which the subject vehicle was slightly used since and parked for over a year awaiting a solution that was not extended, which Kodsy then sold the subject vehicle to the Schumacher HUMMER dealer for approx. six thousand less than purchase price, in addition to a $10,000.00 down payment and approx $13,000.00 in finance payments to the appellees' credit company, which was GMAC Finance company.

Appellant was deprived from his down payment of $10,000  the

22

designated equity for the purchase of the subject vehicle, which Kodsy was deprived from purchasing another vehicle while financing the balance of the vehicle with the GMAC, the agent of debtors at a high interest rate.

Kodsy , experienced a lot of life threatening down time from the subject vehicle's malicious repairs that did not solve anything, instead disabling injuries increased from the reliance on the dealer and manufacturer, which Kodsy, relied on them to know just a little more than Kodsy, where if this elevated vibration was disabling that it would have been warned,  instead the reliance,  received malicious misrepresented repairs and conspired upon malicious allegations to further injure the consumer and to deprive him from a refund or replacement, after all failed attempted repairs were conducted with out a measurement for an elevated whole body vibration detected in the subject vehicle, where it was documented that the elevated vibration remained and that several nonconformities existed and were disregarded.

## **RELIEF THOUGHT**

Appellant Kodsy, herein,  request from this Honorable court to review the material provided in the index, to further correlate the issue of nonconformity, re the elevated bio-mechanical exposures from an elevated vibration, which caused disabling injuries and near death from prolonged over exposures. See, 177 pgs., **OSHA NIOSH**, DOCUMENT,

## "PROCEEDINGS OF THE FIRST AMERICAN CONFERENCE ON HUMAN VIBRATION".

Wherefore appellant request a summary judgment, where there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56(c).** see, **Anderson v. Liberty Lobby, inc., 477 U.S. 242, 251-252 (1986).**

Kodsy's claim should be a secured claim in this bankruptcy proceeding According to **section, 523(a)(6),** due to the appellees' intentional malice and misrepresentations, which fraudulently induced and obtained Kodsy's equity in the purchase of a wholesaled, undisclosed and unwarned, HUMMER H2, SUV., SHOW TRUCK, which had a previously known defect by the manufacturer of the subject vehicle, which maliciously conspired to deny relief, with intent to injure.

See also, **Poole, 167 Ill. 2d at 48, 212 Ill.Dec. 171, 656 N.E.2d at 771.** Our supreme court has continued to state that punitive damages may be awarded for gross negligence showing a wanton disregard for the rights of others.

24

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response and all other motions submitted,

has been typed using times new roman 14-point font, and therefore complies

with the font requirements of Florida rules of Appellate Procedure

9.210(a)(2).

## CERTIFICATE OF SERVICE

ALL ASSERTIONS MADE IN THE FOREGOING INSTRUMENT,

ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

AND BELIEF AND THAT A COPY WAS FILED AND SENT TO

THE APPELLEES'S ATTORNEY OF RECORD, BY EMAIL AND

U.S. MAIL ON AUGUST 26TH , 2011 .

SHERIF RANK KODSY
Individual/pro'se
15968 LAUREL OAK CIRCLE
DELRAY BEACH FLORIDA 33484
561-666-0237

COPY(S) TO:
WEIL, GOTSHAL & MANGES LLP.
767 FIFTH AVENUE
NEW YORK, NEW YORK 10153

25